UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| BERNARD THORNTON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:12CV479 SNLJ |
| | ) | |
| CHARTER COMMUNICATIONS, | ) | |
| LLC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on defendants Charter Communications, LLC and

Charter Communications, Inc.'s motion for summary judgment.  The motion has been

fully briefed and is ready for disposition.  For the following reasons, the Court will grant

the motion for summary judgment.

## I.    Background

Plaintiffs Bernard Thornton, Lejuan Wiley, and Tyrone Cameron ("plaintiffs")

filed a multi-count complaint[1] against defendants Mainline Communications, LLC,

Rodger Miller, Charter Communications, LLC, and Charter Communications, Inc.

alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*,

and the Missouri Minimum Wage Law ("MMWL"), § 290.500 RSMo., *et seq.*, as well as

common law claims for breach of the covenant of good faith and fair dealing, quantum

---

[1] Since the filing of the complaint, eight additional Mainline technicians have filed
consents to join as plaintiffs including Shawn Brooks, Robert Fulton, Terry Gear, Paul
Johnson, Ken Scarbrough, Anthony Thomas, Alexander Grimes, and Marcus Fulton.

meruit, and unjust enrichment.  Plaintiffs allege that they were misclassified as independent contractors, denied overtime pay, and had amounts improperly deducted from their paychecks prior to July 2011, and continued to be paid improperly after they were reclassified as employees in July 2011.  Plaintiffs allege they were jointly employed by the defendants.  Charter Communications, LLC, and Charter Communications, Inc. ("Charter" or "defendants") filed this motion for summary judgment seeking a determination that plaintiffs were not Charter employees.

## II.   Facts

At the outset, the Court notes that the parties have alleged a substantial number of statements of undisputed material facts, with each side purporting to dispute a considerable number of the other's facts.  Additionally, plaintiffs have recited numerous facts in their attempts to dispute defendants' facts.  The parties' disputes, however, primarily pertain to the meaning or significance of the facts.  Both parties are guilty of quibbling over perceived nuances within many of the statements of fact.

Further, the parties are guilty of making the process of determining which facts are properly supported and whether the facts are disputed or undisputed difficult.  Defendants cited to the record by reference to the name of the document, i.e. Miller 2012 Dep. and Williams Decl., instead of referring to Exhibit C or Exhibit J.  While defendants supplied an appendix with the exhibit letters and identification of the exhibit, it added an unnecessary and inconvenient step for the Court.  Plaintiffs are guilty of alleging a fact is

disputed and then reciting facts and citations to the record that are not responsive.[2]
Plaintiffs are also guilty of unduly long responses to defendants' facts[3] and unnecessarily
repeating the same facts and citations.[4]

The Court has reviewed the statements, the responses, and the supporting
documentation, and, where appropriate, will accept facts as supported by appropriate
admissible evidence.  In accordance with Local Rule 4.01 (E), all matters set forth in the
movants' statement of facts are deemed admitted unless specifically controverted by the
opposing party.  The following facts are undisputed or uncontroverted, except where
indicated, and set forth in the light most favorable to plaintiffs.

Plaintiffs worked as technicians for Mainline Communications, Inc. ("Mainline")
installing and repairing cable, internet, and telephone services.  At all times relevant,

---

[2] For example, defendants' fact #97 states that "[p]laintiffs received their paychecks from
Mainline, not Charter" and cites to deposition testimony of plaintiffs Cameron and
Thornton.  Plaintiffs allege the fact is disputed and then proceed to dispute the fact by
citing to testimony that Mainline set the rates that its technicians were paid based upon
what Charter paid Mainline.  Plaintiffs then cite to testimony regarding uniforms, the
time and days that plaintiffs had to report to work, customer window time frames,
technician numbers, and inspections of Mainline technicians' work, among others. These
record citations do not address whether plaintiffs received their paychecks from Mainline.
Either plaintiffs did or did not receive their paychecks from Mainline.  Plaintiffs' single-
spaced, page long response does not directly address the fact alleged.  The Court is
uncertain how plaintiffs' can justify their dispute of this fact.

[3] For example, it should not take a single-spaced, page long recitation of facts to respond
to defendants' statement of fact that plaintiffs received their paychecks from Mainline,
not Charter.  Plaintiffs' response to defendants' 103 statements of fact is 117 pages in
length with plaintiffs' responses to the individual facts in single-spaced format.

[4] For example, there are five paragraphs in response to defendants' fact #12 that are
repeated in response to defendants' facts #13, 16, 24, 30, 32, 33, 34, 36, 37, 38, 39, and
40.

Rodger Miller was the owner of Mainline.  Mainline was a contracting company that performed services for Charter.  Charter entered into a contract with Mainline in 2008, titled the Master Contractor Agreement (the "Agreement").  Charter and Mainline subsequently entered into amendments and addenda to the Agreement throughout the duration of their contractual relationship, including Scopes of Work ("SOW"), which described in detail the work to be completed under the Agreement.

Mainline was required to perform installation, disconnect, and repair services in the manner set forth in the SOW appended to the Agreement.  The Agreement stated:

> Independent Contractor Status. It is the intention of the parties that Contractor perform the Work as an independent contractor for Charter. Contractor, and not Charter, shall be responsible for the hiring, supervision, discipline and control of its employees, and in no event shall Contractor or its employees be considered or act as employees, agents, joint venturers, or partners of Charter. Nothing in this Agreement shall be interpreted or construed as creating or establishing the relationship of employer and employee between Charter and either Contractor or any employee or agent of Contractor. Contractor will be solely responsible at all times for its acts and omissions or the acts and omissions of its agents, employees and subcontractors.

Although the Agreement did not bar Mainline from contracting with other cable or satellite installation companies, Charter was Mainline's only customer.  There is a dispute as to whether a Charter manager told Miller that Mainline could not perform services for competing cable companies while under contract with Charter.[5]

---

[5] Plaintiffs filed an Affidavit from Miller that states "Ron Williams of Charter Communications, in that time period and in previous years, communicated to me that Charter Communications would not permit Mainline and its technicians to perform services for other competing communication companies."  There are, however, irregularities with regard to the signature and notary information in the Affidavit. Assuming it is true, it was still Mainline's choice to contract only with Charter.

Prior to July 2011, Mainline treated its technicians as independent contractors.[6]  In July 2011, Mainline reclassified its technicians from a 1099 workforce to a W-2 workforce.  Miller of Mainline testified that that "in order [for Mainline] to continue doing work in the St. Louis market, we had to go from a contractor-based company to an employee-based company" and that the reason for the conversion to W-2 was so that Mainline could continue to be a contractor for Charter.

Plaintiffs applied for work and interviewed with Mainline.  However, Charter had to approve a technician before the technician could work in its system.  Additionally, under the Agreement, Charter required background checks and drug tests on all technicians who were going to perform Charter work.  The vendor performing the background checks issued identification badges to Mainline, who issued eligible technicians badges identifying them as Charter authorized contractors.  Charter employee Ron Williams's job duties as a Technical Operations Manager included managing the relationship with fulfillment contract partners such as Mainline.  According to Williams, the purpose of requiring contractor technicians to be properly badged when going into a customer's home is to "give the customer comfort that that person was who they said they were."  Additionally, each technician that Mainline used to perform Charter business was required to have a technician identification number ("tech number").  Charter reviewed Mainline's requests for tech numbers to determine whether a technician already had a Charter identification number with another one of Charter's contractors or whether

---

[6] Plaintiffs contend that they were not independent contracts but instead employees under the FLSA.

there were other issues that would give cause for concern for Charter or its customers, including whether the technician had a history of security, service, or other customer impacting issues.

Charter would request that Mainline management pull certain technicians from Charter business while issues were investigated related to Charter customer safety and service. For example, by e-mail dated January 5, 2009, Williams wrote to Miller that Mark Raymond, a Mainline technician, needed "to be pulled from the field for running cable thru the window." By e-mail dated December 10, 2010, Williams requested that Mainline technician Fabian Williams be pulled from Charter business immediately. Plaintiff Cameron testified that Miller took him out of the field while a customer service issue was being investigated. Miller subsequently told him he was no longer permitted to work in the Charter system and terminated his employment.

According to Miller, Charter would tell Mainline if it no longer wanted a technician doing business for Charter and then Charter would shut down that technician's tech number. The parties agree that Charter could revoke the tech number and badge of a contractor technician but dispute how or why this might occur. Charter admits, however, that it could shut down a Mainline technician's tech number with or without a request from Mainline.

Pursuant to the Agreement, Mainline was required to "have requisite and appropriate manpower necessary to perform the Work in a safe and competent manner." Further, Mainline represented and warranted that "Contractor and its employees, agents, representatives and subcontractors have adequate skill, training, expertise, knowledge and

experience to perform the Work in a competent and professional manner." Mainline requested that a new technician complete an informational sheet at the time the technician began working with Mainline, which contained information regarding the type of vehicle a technician would use to perform the work, how many years the technician had been installing residential cable services, and any prior installation companies with which he worked. Mainline trained new technicians by sending them out with experienced Mainline technicians and by providing classroom training. Plaintiffs testified that when they began their employment with Mainline, they received training from Mainline co-workers. Plaintiffs were also required to train other employees of Mainline while employed there.

Charter provided information and training to Mainline's management regarding new Charter products and the specifications for the installation of such products. Williams testified that Charter made certain training available to Mainline's management and supervisors "so they could better train their technicians." Charter made an IQ Manual available to Mainline's management that contained installation specifications for Charter's products. In 2011, Charter provided Customer Experience Training to contractors' management, supervisors and technicians, including Mainline technicians, regarding skills for interacting with Charter's customers in their homes. Pursuant to the Agreement, Charter had the right to, at any point, require plaintiffs and other Mainline technicians to attend one or more training sessions given by a Charter representative "for the purpose of learning and adhering to the required specifications set forth by Charter."

Plaintiffs testified that Williams would come to the Mainline offices to provide information about new equipment and technological changes in the system.  Additionally, Charter would train Mainline supervisors and technicians on installation of new equipment.  According to plaintiffs, at times technicians would go to a Charter office for meetings and training on new equipment.

The Charter-Mainline Agreement provided that "Contractor shall furnish all labor, transportation, incidental equipment, tools and all other materials necessary to complete the Work."  Plaintiffs provided their own trucks or used trucks provided by Mainline; they were not provided trucks by Charter.  Technicians purchased tools from commercial retailers or from Mainline.  According to plaintiffs Thornton and Wiley, on at least one occasion, they attended a Charter training class during which Charter swapped out their older tools for new tools because their tools were not up to Charter code.   Mainline technicians purchased signs for their vehicles from Mainline that said "Mainline Communications," and also purchased uniforms from Mainline that said "Mainline" and "Authorized Contractor for Charter."  Mainline technicians picked up and returned equipment from and to Mainline, not Charter.  Charter provided Mainline with certain proprietary equipment such as cable boxes, modems, keys for lock boxes, fittings, ground blocks, and other items needed to perform the work under the Agreement.  Charter required contractors to purchase carrying cases or totes for carrying Charter's proprietary equipment to protect the equipment.  Also, by e-mail dated February 9, 2011, Williams informed Mainline that each Mainline technician was required to have leakage gear.

8

Mainline provided a truck count to Charter on a weekly basis with the number of trucks that Mainline planned to have in the field on a given day.  At the beginning of each day, Charter gave work orders to Mainline in bulk based on the truck count.  Mainline, in turn, routed and assigned the work orders to its technicians.  Mainline dispatchers routed work to Mainline technicians via a program used by Charter known as Workforce Express ("WFX").  Once the Mainline technicians picked their route, Mainline would load it into the Charter WFX system and the technicians could access the information in WFX on their cell phones.  Charter required that the Mainline technicians, including plaintiffs, use the WFX tool.

WFX was a paperless system that allowed Mainline technicians to use their phones to open and close jobs, make changes to jobs, and ensure that customers were receiving the correct services.  Charter's WFX tool allows Charter representatives to "go in and look at whatever they may need to look at" on a daily basis with respect to contract technicians.  Through its WFX tool, Charter could track time on a job (including when a tech arrives for and leaves a job), drive time between jobs, lunch breaks, routing, late appointments, and repeat service and installation call rates.  The parties dispute whether Charter, in fact, tracked contractor technicians but it is undisputed that it had the capability to do so.  The tool allowed Charter to see when a technician was on a job, when the job was completed, and when the technician was in route to another job.  Plaintiffs and other Mainline technicians logged into the system by their tech number.

Mainline maintained its own dispatch department and Mainline technicians generally contacted Mainline's dispatch department first if they encountered any issues

while out in the field.  Mainline also asked its technicians to call into dispatch at the end of the day when they had completed their routes.  Plaintiffs contacted Charter dispatch if Mainline's dispatch department was closed or its computers were down, if there was a more serious technical issue with the Charter equipment, or if they made a sale in a customer's home, because only Charter's dispatch had access to the customer account information.  If a Mainline technician worked a telephone installation project, that technician had to contact Charter to activate the service.  Plaintiff Terry Gear testified that Charter dispatchers would sometimes override decisions made by Mainline and he would be told to return to a customer's home.  He also testified that Charter dispatchers would inquire about his estimated time of arrival to a customer's home or his time frame to complete an installation.

Under the Agreement and SOW, Charter required that Mainline complete work orders "within the 'On-Time Guarantee' period set forth for each such work order on the work order."  Charter manager Don Brendel testified that Charter is accountable for its customer's appointments and "if I see my customer's appointments not being handled correctly or in jeopardy of being missed, then I'll escalate to [the contractor's] management so they can do whatever they needed to do on their side to supervise the situation."

Mainline held weekly meetings with its technicians during which Mainline would convey information passed down by Charter.  Additionally, Williams testified that Charter provided performance data to management for Mainline and other contractors to facilitate improvement in their service of Charter's customers, including data related to

10

repeats (whether Charter had to go back to a customer's home within seven days of service), non-responder equipment (which show equipment in customers' homes that is not working), on time arrivals, EQA results (measures whether a modem is performing properly), and video on demand ("VOD") welcome video usage.  Williams testified that the performance information communicated to Mainline included data regarding Mainline's individual technicians because Charter "track[s] by contractor and then the techs are components of the contractors."  Williams testified that after providing the contractors with performance data, Charter asked Mainline and other contractors to provide Charter with plans on how to improve the contractors' performance.

Williams regularly asked Mainline to implement action plans to enhance the performance of its technicians.  Williams would hold weekly conference calls to track the progress of these action plans.  Some of these action plans involved Williams asking Mainline to bring certain technicians back into training.   By e-mail dated January 14, 2011, Williams wrote Brendel, both Charter employees, stating:

> Triple play techs—all come out of training with ability to perform all lines of business except for Mainline—we discussed and they agree on the benefit of the expectation and will remodel their training department to better facilitate a tech better positioned to leverage his/her skills to the needs of the customer. Mainline is to follow up me on next Thursday with their road map to expectation.

By e-mail dated March 27, 2012, Williams wrote Miller regarding its high repeat service call rate. In that e-mail, Williams identified two technicians and asked "Do they have a meter, if so was it not used, I can't imagine that either need to trained on the meter. Does Mainline need to pull both techs back into training"?  Williams further told Miller to "provide me with action plans to prevent same by end of day today."  In July 2009,

11

Williams wrote Miller, among others, regarding technicians who had five to ten non-uses of the VOD video.  Williams wrote that he expected Miller to have face-to-face meetings with these technicians by no later than July 24, 2009.  Williams also asked whether Mainline was placing proper emphasis on the VOD video as part of its technician training program.

Pursuant to the Agreement, Charter had the right to conduct inspections of Mainline technicians' work for compliance with Charter's specifications.  Specifically, the Agreement provided:

> Work performed by the Contractor, its subcontractors or agents may be inspected by Charter representatives for compliance with Charter's specifications. . . . If Charter so directs, Contractor shall make weekly or monthly written progress reports to Charter's designated representatives on Charter provided forms or in a format otherwise specifically approved by Charter in writing.

Under the SOW, Mainline was required to perform technical quality assurance reviews on a minimum of ten percent of all jobs assigned to each Mainline technician in each month.  Mainline had a Technical Quality Assurance Officer, Jonathan McNeil, who performed quality assurance checks of Mainline technicians' work.  Miller testified that Mainline went back out to confirm that its technicians had corrected the work "because ultimately we're held responsible, not [the technicians]."  If Charter determined that work performed by Mainline did not comply with those specifications, Mainline had five days to correct/redo the non-complying work.  The Agreement provided that if Mainline failed to correct the non-complying work, "[n]o payment shall be made or required of Charter."  If the non-complying work was discovered after payment was made to Mainline, Charter had "the right of set off" and could "withhold payment of future invoices in an amount

equal to payments made for or the projected or actual cost to correct/redo the Non-Complying Work." Similarly, the SOW provided that Charter could charge back the cost of the non-complying job from Mainline's invoice.

On a number of occasions, Williams would show up in the morning and inspect the Mainline technicians' vehicles to determine whether they had Charter signs in the truck and whether they had the correct meters in their vehicles. Williams testified that when Charter performed a contractor site visit at Mainline, Charter inspected Mainline's warehouse and vehicles: (1) to make sure that Charter's equipment was secure; (2) that Mainline technicians had meters that could properly troubleshoot, provide service to the customer; (3) the technicians' vehicles had proper signage so that when they arrive at a customer's home, the customer knows that they are representing Mainline for Charter; (4) that Mainline's technicians were wearing their identification badges; and (5) that Mainline did not have a technician with holes in his clothes and that the technician was going to present to the customer what the customer would expect. Mainline technician Terry Gear testified that over the years, Williams came to Mainline's office under ten times. On at least one occasion, Charter representative Todd Arnett toured Mainline's facilities and spot-checked some of Mainline's vehicles.

Charter and Mainline determined the prices Charter paid Mainline for services. Mainline, not Charter, chose to pay its technicians on a piece rate basis and set the rates that its technicians were paid. Charter did not pay the Mainline technicians and had no input into or knowledge of how much Mainline paid technicians for their services or whether Mainline passed any chargebacks or debits through to the technicians. It was up

to Mainline to decide whether to pass the chargebacks or debits through to the technicians.

Mainline technicians filled out daily logs that they used to bill Mainline for the work they completed and they turned the logs and other paperwork into a mailbox at Mainline's facility each day.  Miller testified that Mainline used the logs to invoice Charter for the completed work.  Mainline used a standing form that Charter provided but it had the Mainline name on it.  Charter paid Mainline directly for the work completed by Mainline's technicians.  Miller testified that Mainline, in turn, sent the technicians' logs or time sheets to a payroll company and the payroll company issued the paychecks to Mainline technicians.  Miller testified that Mainline created the logs for its technicians "so we know how much we owed people based off of the paperwork that they turned in when they billed us."  Plaintiffs received their paychecks from Mainline, not Charter. The parties dispute whether plaintiffs went to Miller or other Mainline supervisors or Charter regarding questions as to chargebacks.

Miller testified that Mainline kept a file for each technician containing the technician's independent contractor agreement and pay sheets.  Each Mainline technician had a mailbox with his name on it at Mainline's office and Mainline would put documents for the technicians into the mailboxes, such as quality control reports.  Miller testified that Charter maintained daily log records for the Mainline technicians.  Mainline did not maintain these records, but could go into Charter's WFX system through Charter's shared contractor's website to view this information for its technicians.  Charter allowed Mainline a 24-hour window to download the WFX records, after which Mainline

14

was prohibiting from accessing the technician information that was stored on Charter's system.  Charter produced a contractor TPS summary for Mainline and other contractors that served as a technician productivity score card. The summary showed on-time arrival for customer appointments.

On January 14, 2013, Mainline sent a letter notifying Charter that Mainline would "no longer be able to fulfill [its] partnership relation with Charter" and that Mainline's last day of performing services for Charter would be January 19, 2013.

## II.    Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden is on the moving party.  *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op. Inc.*, 838 F.2d 268, 273 (8th Cir.1988).  After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts.  *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party bears the burden of setting forth affirmative evidence and specific facts by affidavit and other evidence showing that there is a genuine dispute of a material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex*, 477 U.S. at 324.  "A dispute about a material fact is 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Herring v. Canada Life Assur. Co.,* 207 F.3d 1026, 1030 (8th Cir. 2000) (quoting *Anderson,* 477

15

U.S. at 248).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson,* 477 U.S. at 247–48.  A party resisting summary judgment has the burden to designate the specific facts that create a triable controversy.  *See Crossley v. Georgia–Pacific Corp.,* 355 F.3d 1112, 1114 (8th Cir. 2004).

In ruling on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts.  *Matsushita,* 475 U.S. at 587; *Woods v. DaimlerChrysler Corp.,* 409 F.3d 984, 990 (8th Cir. 2005).  The Court may not "weigh the evidence in the summary judgment record, decide credibility questions, or determine the truth of any factual issue." *Kampouris v. St. Louis Symphony Soc.,* 210 F.3d 845, 847 (8th Cir. 2000).  However, the court is required to resolve all conflicts of evidence in favor of the nonmoving party.  *Robert Johnson Grain Co. v. Chemical Interchange Co.*, 541 F.2d 207, 210 (8th Cir. 1976).

## III.    FLSA – Joint Employer

The FLSA provides minimum and overtime pay scales for covered employees.  29 U.S.C. §§ 201–219.  Under the FLSA, "employee" is defined as "any individual employed by an employer."  29 U.S.C. § 203(e)(1).  The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee" and "employ" as "to suffer or permit to work."  29 U.S.C. § 203(d); 29 U.S.C. § 203(g).  These terms are broad and comprehensive in order to accomplish the remedial

16

purposes of the FLSA.  *United States v. Rosenwasser,* 323 U.S. 360, 362–63, (1945).

Under the FLSA, two or more employers may employ a person jointly, and each joint

employer is individually responsible for complying with the FLSA with respect to the

entire employment.  29 C.F.R. § 791.2(a).

     "[E]mployment status is determined based on the economic reality of the

relationship between the plaintiff and defendants, rather than concepts of agency law."

*Schubert v. Bethesda Health Group, Inc.*, 319 F.Supp.2d 963, 971 (E.D. Mo. 2004).  The

Eighth Circuit has not yet set out a test to determine whether an entity may be held to be

a joint employer under the FLSA.  However, several district courts in the Eighth Circuit,

and in other circuits, have applied the following four factors in making the determination

as to whether an entity may be held to be a joint employer: (1) the power to hire and fire

the plaintiffs; (2) supervision and control of the plaintiffs' work schedule or conditions of

employment; (3) determination of the rate and method of payment; and (4) maintenance

of the plaintiffs' employment records.  *Arnold v. DirectTV, Inc.*, 4:10CV352 JAR, 2012

WL 4480723, at *4 (E.D. Mo. Sept. 28, 2012); *Schubert,* 319 F.Supp.2d at 971 (citing

*Baker v. Stone County,* 41 F.Supp.2d 965, 980 (W.D. Mo. 1999)); *Zampos v. W & E*

*Communications, Inc.*, 970 F.Supp.2d 794, 802 (N.D. Ill 2013); *Valdez v. Cox*

*Communications Las Vegas, Inc.*, No. 2:09-CV-01797-PMP-RJJ, 2012 WL 1203726, at

*1 (D. Nev. April 11, 2012); *Lawrence v. Adderley Indus., Inc.,* No. CV-09–2309, 2011

WL 666304, at *7 (E.D.N.Y. Feb. 11, 2011); *Jacobson v. Comcast Corp.,* 740 F.Supp.2d

683, 689 (D.Md. 2010).  These factors have been referred to as the formal control factors.

*See Lawrence,* 2011 WL 666304, at \*7-10; *Jean-Louis v. Metropolitan Cable Communications, Inc.*, 838 F.Supp.2d 111, 123-131 (S.D. N.Y. 2011).

Additional factors considered by district courts in other circuits, referred to as the functional control factors, include all or part of the following: (1) whether the alleged employer's premises and equipment were used for the plaintiffs' work; (2) whether plaintiffs shifted from one putative joint employer's premises to that of another; (3) the extent to which the work performed by plaintiffs was integral to the overall business operation; (4) whether plaintiffs' work responsibilities remained the same regardless of where they worked; (5) the degree to which the alleged employer or its agents supervised plaintiffs' work, and (6) whether plaintiffs worked exclusively or predominantly for one defendant. *Barfield,* 537 F.3d 132, 143 (2d Cir. 2008); *Zheng v. Liberty Apparel Co. Inc.,* 355 F.3d 61, 72 (2d Cir. 2003); *Lawrence*, 2011 WL 666304, at \*7, 10-11; *Jean-Louis*, 838 F.Supp.2d at 131-135; *Jacobson*, 740 F.Supp.2d at 693.

The Fifth Circuit has utilized the four formal control factors plus the following five factors: "(1) Whether or not the employment takes place on the premises of the company?; (2) How much control does the company exert over the employees?; (3) Does the company have the power to fire, hire, or modify the employment condition of the employees?; (4) Do the employees perform a 'specialty job' within the production line?; and (5) May the employee refuse to work for the company or work for others?" *Cooke v. Jasper*, 2010 WL 4312890, at \*4 (S.D. Texas 2010) (quoting *Wirtz v. Lone Star Steel Co.,* 405 F.2d 668, 669–70 (5th Cir. 1968)).

18

Instead of the formal and functional control factors, some courts employ factors similar or identical to the *Dole v. Amerilink Corp.* 729 F.Supp. 73, 76 (E.D. Mo. 1990) six factors:  (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers; (4) whether the service rendered requires a special skill; (5) the degree of permanency and duration of the working relationship; and (6) the extent to which the service rendered is an integral part of the alleged employer's business.[7]  *See Chao v. Mid-Atlantic Installation Services, Inc.*, 16 Fed.Appx. 104, 106 (4th Cir. 2001); *Lang v. DirectTV, Inc.*, 801 F.Supp.2d 532, 536 (E.D. La. 2011); *Herman v. Mid-Atlantic Installation Services, Inc.*, 164 F.Supp.2d 667, 671 (D. Md. 2000). One district court has utilized a combination of formal control factors, functional control factors, and *Dole* type factors.  *See Valdez*, 2012 WL 1203726, at *1.

Under Missouri law, when joint employment is alleged along with violations of the Missouri Minimum Wage Law, Missouri courts consider the following factors:  "(1) who has the power to hire and fire the worker; (2) who supervises and controls the worker's work schedule and conditions of work; (3) who determines the rate and method of payment of the worker; (4) who maintains work records; and (5) whether the alleged

---

[7] The *Dole* factors have been considered by district courts in the Eighth Circuit to determine the economic reality of the working relationship as to whether a person is an employee or independent contractor.  *Dole*, 729 F.Supp. at 76; *Pennington v. Integrity Communications, Inc.*, 1:12CV5 SNLJ, 2014 WL 2106301, at *3 (E.D. Mo. May 20, 2014).

employers' premises and equipment were used for the plaintiff's work." *Tolentino v. Starwood Hotels & Resorts Worldwide, Inc.*, 2014 WL 4086373, at *3, --- S.W.3d --- (Mo. banc Aug. 19, 2014).

## IV.   Discussion

Defendants' motion for summary judgment seeks a determination that plaintiffs were not Charter employees.[8]  Charter contends that plaintiffs cannot establish that Charter was their "joint employer" – a prerequisite to liability under any of plaintiffs' claims.  Charter alleges that the undisputed facts establish that Mainline, not Charter:  (1) controlled the hiring and firing of Mainline technicians; (2) trained its technicians, provided them with the requisite tools and uniforms, and set their schedules; (3) routed plaintiffs, managed their individual performance, and disciplined them when necessary; and (4) determined how and what to pay them.  Charter argues that the well-established body of case law on this type of joint employment claim in the cable industry demonstrates that plaintiffs' claims should be rejected.

In response, plaintiffs argue that the "economic reality" of the relationship between Charter and Mainline is the entities were in fact partners who jointly engaged in an employment relationship with plaintiffs under the FLSA.  In support of their position, plaintiffs largely rely on Charter's extensive quality control procedures and the

---

[8] Beginning in July 2011, Mainline technicians were employees of Mainline.  Prior to July 2011, Mainline treated its technicians as independent contractors.  For purposes of this motion, in determining whether Charter was a joint employer the Court will assume that Mainline technicians were employees at all relevant times.  *See Chao*, 16 Fed.Appx. at 108 (finding that "because MAT cannot be considered the Installers' employer, neither can Comcast, whose only relationship with them is via its contract with MAT").

provisions of the Agreement between Mainline and Charter.  Plaintiffs contend that

"everything that happened at Mainline, including every change, was because Charter

wanted it that way."  Plaintiffs point out that Mainline worked exclusively for Charter,

which they contend resulted in Charter controlling the hiring and firing of technicians and

supervising and controlling the plaintiffs' work schedules and conditions of employment.

Plaintiffs argue that Charter controlled the manner in which technicians would be paid

because Mainline paid its technicians based upon how Charter set prices for jobs.

Additionally, plaintiffs contend that Charter maintained voluminous employment records

for technicians via the information on Charter's WFX system.  Plaintiffs also argue that

all of the reports Charter generated, including the performance reports for its outside

contractors based upon statistics gather from individual technicians, is illustrative of

employer-type control.

　　　The issue of whether cable technicians supplied to a cable provider by a contract

company were jointly employed by the cable provider has been addressed by district

courts in other circuits in four FLSA cases with significant factual similarities to this

case.  *See Zampos,* 970 F.Supp.2d 794; *Valdez,* 2012 WL 1203726; *Lawrence,* 2011 WL

666304; *Jacobson,* 740 F.Supp.2d 683.  In those cases, the district courts granted

summary judgment to the cable provider. [9]  In each case, as here, the technicians were

---

[9] Additionally, district courts in other FLSA cases have determined, by summary
judgment or stipulated facts, that cable technicians supplied to cable providers by a
contract company were not jointly employed by the cable providers.  *See Chao,* 16
Fed.Appx. 104; *Jean-Louis,* 838 F.Supp.2d 111; *Smilie v. Comcast Corporation*, No. 07-
CV-3231, 2009 WL 913890 (N.D. Ill. Feb. 25, 2009); *Herman,* 164 F.Supp.2d 667.
However, at least one district court has denied a cable provider's motion for summary

responsible for installing cable in customers' homes and were supplied to the cable

company pursuant to a contract with another company.

In *Zampos*, the district court held that Comcast was not the joint employer of

independent technicians who installed and serviced Comcast products.  970 F.Supp.2d at

806.  The *Zampos* plaintiffs made a number of arguments that the plaintiffs make here.

The plaintiffs argued that "Comcast effectively supervises and controls W & E

technicians' conditions of employment because it generates all the work performed by

technicians, provides routing software (TechNet), requires the technicians to complete

work orders within a scheduled window of time, and monitors technician work

performance with respect to estimated time of arrival and job activation."  *Id.* at 803.  The

court found, however, that plaintiffs' argument "largely ignores the difference between

affecting work performance as opposed to exercising supervision or control."  *Id.*

Further, the court stated:

> To the extent that Comcast engages in general monitoring related to quality and
> delivery of services, this type of activity is perfectly consistent with a typical,
> legitimate contracting arrangement. Quality control and compliance-monitoring
> that stem from the nature of the business—that is, from the nature of the goods or
> services being delivered—are qualitatively different from control that stems from
> the nature of the relationship between the employees and the putative employer.

*Id.* at 803-04 (internal quotation marks and citations omitted).

---

judgment finding that based on the particular facts of that case a reasonable fact-finder
could conclude that the installers were jointly employed by the cable company and the
contracting company.  *See Keeton v. Time Warner Cable, Inc.*, No. 2:09-CV-1085, 2011
WL 2618926 (S.D. Ohio July 1, 2011).  Another district court denied summary judgment
to a satellite provider in a FLSA joint employment case finding that there were disputed
issues of material fact.  *See Lang*, 801 F.Supp.2d 532.

Additionally, the *Zampos* plaintiffs argued, as the plaintiffs do here, that the cable company determined their pay.  Specifically, they argued that "Comcast plays a significant role in determining how much W & E technicians are paid simply because it pays W & E on a per service basis, itemizes how long work tasks should take, and associates point value and hourly rates for each job." *Id.* at 804.  The Court rejected this argument stating, "[a]n employee's income, received from its direct employer, will always be determined and influenced by what a contractor decides to pay the direct employer for services rendered by the employee." *Id.* (internal quotation marks and citations omitted).

The court also rejected the plaintiffs' argument that maintenance of personnel and performance based records was an indication of employment. *Id.* at 805.  Again, an argument made by the plaintiffs in this case.  The court declared that "[w]ithout the retention of these personnel and performance based records, Comcast could not ensure that W & E technicians are fit to enter customer's homes, that Comcast receives the services for which it is entitled, and that the W & E technicians fulfilling installation services are authorized to do so." *Id.* (internal quotation marks and citations omitted).

Further, like the plaintiffs here, the *Zampos* plaintiffs argued that the fact that W & E's business was tied exclusively to Comcast was evidence of joint employment. *Id.* Comcast was W & E's only customer apparently by its own choice as the contract between Comcast and W & E was non-exclusive. *Id.*  The court found that "[e]ven viewing the evidence in the light most favorable to plaintiffs, the absence of a broad

client base is not a proxy for joint-employment because it is perfectly consistent with a legitimate contracting relationship." *Id.* (internal quotation marks and citations omitted).

In *Valdez*, the district court granted summary judgment for the defendant cable company, Cox Communications Las Vegas, Inc. ("Cox") on the issue of joint employer liability. 2012 WL 1203726, at *6. *Valdez* involved two contract companies that supplied installers to perform work on Cox projects. A contract installer could not receive a badge and work on a Cox project "unless the installer met Cox's standards, which included a background check, a drug test, and a proficiency test." *Id.* at *2. The contract company performed the background check and the drug test and reported the results to Cox. *Id.* The proficiency test was administered by Cox. *Id.* If Cox refused to allow an installer to perform work on its projects, either prior to beginning work or at any time during the installer's employment, the contractor could retain the employee for non-Cox related work. *Id.* Effectively, however, this resulted in termination for installers because both contract companies only did work for Cox.[10] *Id.*

Cox utilized a web-based computer program through which it scheduled service to customers and distributed installation projects to contractors. *Id.* at *3. The program had the capability of daily monitoring of individual installers and could track the progress of every installation job. *Id.* As a result of Cox's quality control procedures, it would identify installers that were not performing well. *Id.* While Cox would not order a

---

[10] One of the contract companies did work for another cable provider in Reno but for installers working in Las Vegas it resulted in a de facto firing. *Valdez*, 2012 WL 1203726, at *2.

contractor to terminate the installer, the contractors would terminate the installer to keep Cox happy with the contractor.  *Id.*

Cox scheduled installations with its customers.  *Id.* at *4.  The contractors had no choice about when to schedule installations.  *Id.*  After Cox distributed work orders to the contractors, the contractors determined their installer's routes.  *Id.* at *3.  Contractor employees were required to comply with Cox's Code of Excellence.  *Id.* at *4.  Cox would complain to a contractor if a customer calls with a complaint about one of the contractor's installers.  *Id.*  Cox evaluated each contractor on a weekly basis and commented on the performance of the contractor's individual installers.  *Id.*  Cox provided the equipment for the install while the installer or contractor provided the necessary tools and vehicle.  *Id.* at *5.

Cox paid the contract companies and the contract companies paid their installers. *Id.* at *4.  Cox did not control the method of payment, or dictate any particular rate or pay structure, for contractor employees.  *Id.*  Each contractor maintained employment records on its installers.  *Id.*  Additionally, Cox maintained a database which contained the installers' names and other identifying information which was gathered as part of the badging process.  *Id.*

The *Valdez* court, after applying the four formal control factors, along with some functional control and *Dole* type factors, concluded that Cox was entitled to summary judgment.  *Id.* at 6.  The court noted that other district courts addressing "this issue ultimately [have] found no joint employment for cable installers at the summary judgment stage under factual circumstances fairly similar to those before this court."  *Id.*

25

In *Lawrence*, the district court granted summary judgment for the defendant cable company, Cablevision Systems Corporation ("Cablevision"), based on its determination that Cablevision was not a joint employer of the cable technicians who performed work for Cablevision's customers pursuant to an agreement between Cablevision and Adderley Industries, Inc. ("Adderley").  2011 WL 666304, at *11.  Adderley agreed to provide "technicians to install, service, repair and remove equipment for Cablevision's customers."  *Id.* at *1.  The contract required that Adderley, and its technicians, perform work in accordance with Cablevision's procedures and specifications.  *Id.*  Pursuant to the terms of the contract, Cablevision gave the technicians Cablevision identification badges, set procedures and specifications for the technicians to follow, had the right to remove technicians from Cablevision jobs, required technicians to arrive at customers' homes at certain times, performed quality control inspections of the technicians' work, and required Adderley to provide ongoing training and background checks before hiring a technician.  *Id.* at *1-4.

Adderley controlled the number of technicians that it would provide Cablevision on a weekly basis, controlled which technicians would be sent to any given Cablevision job, and had the sole power to fire a particular technician.  *Id.* at *2-3.  While Cablevision could request that a particular technician no longer work on Cablevision jobs, Adderley was free to employ that person in another capacity.  *Id.* at *3.  Cablevision, however, was Adderley's only client.  *Id.* at *2.  As a result, Cablevision's request that a technician no longer work on Cablevision's jobs resulted in the technician being fired by Adderley.

Applying the four formal control factors, the *Lawrence* court first determined that Cablevision had no formal control over the technicians.  *Id.* at *7-8.  The court found that the fact that Cablevision required Adderley's technicians to follow certain guidelines and specifications did not weigh in favor of a joint-employer relationship because "[i]t is in the nature of a contract that the contractor . . . promises to deliver the performance bargained for by the client."  *Id.* at *8 (citation omitted).  Further, the court stated that "[r]equiring a contractor [Adderley] to meet the client's [Cablevision's] technical specifications is not the type of control which bestows employee status on the contractor."  *Id.* (internal quotation marks and citation omitted).

The court similarly concluded that the fact that Adderley's technicians wore Cablevision identification badges did not render the technicians Cablevision employees because the wearing of "such identifying materials does not affect the economic reality of the relationship [between Adderley and Cablevision], . . . but merely allows consumers to be assured of the [technician's] *bona fides*."  *Id.* (internal quotation marks and citation omitted).  Likewise, the court found that Cablevision's policy of requiring background checks and requiring technicians to arrive at their customers' homes within certain windows of time were similarly motivated by "good business sense" and the "nature of the business," not any economic reality of an employer-employee relationship.  *Id.* Although Cablevision performed quality control inspections and reviewed the technicians' work, the court held that Cablevision did "not exercise any significant degree of supervision over plaintiff's or any particular technician's work."  *Id.* at *10.

Finally, the *Lawrence* court found it significant that, if hired to do so, "Adderley's business could 'shift as a unit' from Cablevision to another cable media provider."  *Id.*

In *Jacobson*, the district court found that the defendant cable company, Comcast Corporation ("Comcast"), was not a joint employer of cable technicians despite an even greater measure of control exercised by the cable company.  740 F. Supp. 2d 683. Comcast contracted with various installation companies to obtain technicians to install cable for Comcast's customers.  *Id.* at 686.  Comcast required the installation companies to receive approval from Comcast before hiring someone new.  *Id.*  Comcast also had the power to deauthorize a technician, which plaintiffs argued was tantamount to termination because the installers only performed work for Comcast.  *Id.* at 687.  The court noted that "Comcast unquestionably plays a role in hiring and firing technicians."  *Id.* at 689.  The court nevertheless found that such control did not weigh in favor of a joint-employer relationship because "[i]t is only in the context of quality control, however, that Comcast exercises power over the hiring or firing of technicians."  *Id.* at 689-90.

Comcast maintained specific standards that the installation companies and their technicians were required to meet and regularly monitored the technicians to ensure their performance satisfied Comcast's expectations.  In that regard, Comcast monitored the location of technicians, specified the time for appointments, and regularly evaluated completed work.  *Id.* at 691.  Again, the court found that such control was not indicative of an employment relationship because "detailed instructions and a strict quality control mechanism will not, on their own, indicate an employment relationship."  *Id.* at 690, 691-92.  In other words, "[t]he nature of the control exercised by putative joint employer is

28

the key . . . generic control exercised by a supervisor over an independent contractor" will not create an employment relationship.  *Id.*  Rather, control indicating an employment relationship entails developing human resource policies, dictating working conditions, and determining the conditions upon which employees receive payment.  *Id.* at 691.

Here, like *Zampos*, *Valdez*, *Lawrence*, and *Jacobson*, the facts plaintiffs rely on to allege a joint employment by Charter arise from the Charter-Mainline independent contractor agreement and Charter's quality control and customer service procedures. This does not appear to be an unusual contract situation considering the factual similarity to the *Zampos*, *Valdez*, *Lawrence*, and *Jacobson* cases.  This Court finds the reasoning and application of the formal control factors in those cases persuasive.

A.     Power to Hire and Fire

Plaintiffs claim that Charter jointly controlled the hiring and firing of Mainline technicians including plaintiffs.  Plaintiffs contend that Charter had significant control over the hiring of Mainline technicians because it had to pre-approve the hire of every Mainline technician.  It is, however, undisputed that the pre-approval was limited to Mainline technicians servicing Charter customers, and was to ensure customer safety and quality service.  Further, plaintiffs claim that Charter's deauthorization of tech numbers evidences control over the firing of Mainline technicians.  Again, Charter's deauthorization of a tech number was to ensure customer safety and quality service. These actions do not evidence a joint employer relationship.  *See Zampos,* 970 F.Supp.2d at 803 (finding that where Comcast provided tech numbers and identification badges to contractor technicians to protect the safety and security of Comcast's customers and

29

reserved the right to de-badge technicians for security related reasons, "this purported control, relating to the safety and security of Comcast customers, is qualitatively different than the control exercised by an employer"); *Lawrence*, 2011 WL 666304, at *3, 10 (finding no joint employer relationship where "Cablevision can direct Adderley not to assign an individual who was previously employed by one of its other contractors and had been disciplined or fired for bad performance to a Cablevision project and has removed technicians from its list of approved workers"); *Jacobson*, 740 F.Supp.2d at 689-90 (holding that Comcast only exercised power over the hiring and firing of technicians in the context of quality control and such control did not weigh in favor of a joint-employer relationship).

B.      Supervision and Control of Work Schedule or Conditions of Employment

Plaintiffs emphasize the quality control measures that Charter undertook as an indication of employment.  Plaintiffs' argument, however, "ignores the difference between affecting and supervising and controlling." *Jean-Louis*, 838 F.Supp.2d at 126. Further, "supervision with respect to contractual warranties of quality and time of delivery has no bearing on the joint employment inquiry, as such supervision is perfectly consistent with a typical, legitimate subcontracting arrangement." *Id.*  It is well-established that measures such as tracking on-time arrivals, requiring Mainline to ensure quality performance and service, assistance with billing and activation for Charter customers, and requiring that Mainline technicians follow Charter technical specifications when installing Charter equipment are typical in a contractor relationship and do not establish joint employment.  As set forth above, the district courts in *Zampos*, *Valdez*,

*Lawrence*, and *Jacobson* all found that this type of quality control and compliance monitoring stem from the nature of the cable provider business and the need to provide reliable service to customers, not the nature of the relationship between the technicians and the cable provider, and do not establish joint employment by the cable provider.  *See Zampos,* 970 F.Supp.2d 794; *Valdez*, 2012 WL 1203726; *Lawrence*, 2011 WL 666304; *Jacobson,* 740 F.Supp.2d 683.

Plaintiffs point to Miller's statement that "[i]n all aspects of the Mainline installation operations involving the technicians and Charter's customers, everything was Charter's doing" as evidence of joint employment.  Contrary to plaintiffs' position, this is consistent with a legitimate contracting arrangement.  Charter had a significant interest in protecting its customers and ensuring its customers received the correct services on time.  Mainline contracted with Charter to perform installation operations in accordance with Charter's procedures and specifications.  Again, this Court agrees with the district courts in *Zampos*, *Valdez*, *Lawrence*, and *Jacobson* that Charter's significant quality control measures do not establish joint employment.

C.      Determination of the Rate and Method of Payment

Courts likewise have rejected plaintiffs' argument that Charter controlled the "manner" in which plaintiffs were paid by requiring Mainline to reclassify its technicians from independent contractors to employees and by setting the prices that Charter paid Mainline for performing services.  *See Zampos*, 970 F.Supp.2d at 804 (rejecting argument that cable provider determined technicians pay structure because it paid contractor on a per service basis and set the rates paid to the contractor); *Jacobson*, 740 F. Supp. 2d at

31

686 (finding no joint employment where cable company required Installation Companies to hire technicians as W-2 employees, rather than 1099 independent contractors); *Jean-Louis,* 838 F. Supp. 2d at 129-130 (finding that what a cable company pays a contractor for services may affect technicians' pay, but does not determine it).

     D.     Maintenance of Employment Records

Plaintiffs argue that Charter's maintenance of "voluminous" records regarding the technicians is evidence of an employment relationship.  However, Charter's maintenance of records is part of its quality control procedures and to verify that jobs are satisfactorily completed.  *See Zampos,* 970 F.Supp.2d at 805-806 (finding no joint employer relationship where Comcast retained records on technicians including "W & E technician badge identification request forms; quality check forms; the Comcast Contractor Checklist, signed by W & E management, and submitted to Comcast, that includes personal information: contact information, social security numbers, licensing information, vehicle information, background check information, and drug screening information; and a list of technicians whose identifications numbers are to be terminated [as it] is only an extension of Comcast's quality control procedures").

     E.     Other Factors

District courts in the Eighth Circuit have not recognized the application of the functional control factors utilized by some district courts in other circuits.  However, under Missouri law, for claims under the Missouri Minimum Wage Law based on joint employment, the four formal control factors are considered along with one functional control factor – "whether the alleged employers' premises and equipment were used for

32

the plaintiff's work." *Tolentino v. Starwood Hotels & Resorts Worldwide, Inc.*, 2014 WL 4086373, at *3, --- S.W.3d --- (Mo. banc Aug. 19, 2014).  Here, Charter's premises were not used for the plaintiffs' work.  Plaintiffs' services were provided in Charter's customer's homes.  Charter provided Mainline with certain proprietary equipment such as cable boxes, modems, keys for lock boxes, fittings, ground blocks and other items needed to perform the work under the Agreement.  The technicians picked up this equipment from Mainline for the work orders to be completed.  Otherwise, the technicians used their own trucks, or trucks supplied by Mainline, and their own tools to perform the work.  The only exception seems to be the one occasion when Charter swapped out a few of Thornton's and Wiley's old tools for new tools because their tools were not up to Charter code.  This factor weighs against a finding of joint employment.

## IV.    Conclusion

Like Comcast in *Jacobson*, Charter's "quality control procedures ultimately stem from the nature of their business and the need to provide reliable service to their customers, not the nature of the relationship between the technicians and [Charter]." *Jacobson*, 740 F.Supp.2d at 691-92.  While Charter's "supervision and control may appear substantial in degree, it is qualitatively different from the control exercised by employers over employees."  *Id.*

Based on the foregoing, this Court finds that plaintiffs were not Charter employees under the FLSA or Missouri law.  Therefore, the Charter defendants are entitled to judgment as a matter of law on all of plaintiffs' claims in that all of the claims are based on allegations of joint employment.

Accordingly,

**IT IS HEREBY ORDERED** that defendants Charter Communications, Inc. and

Charter Communications, LLC's motion for summary judgment (ECF #96) is

**GRANTED**.  A separate Judgment will accompany this Memorandum and Order.

Dated this 25th day of September, 2014.

STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE