UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| BERNARD THORNTON, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 4:12-CV-00479 SNLJ |
| ) | |
| MAINLINE COMMUNICATIONS, ) | |
| LLC, et al., ) | |
| ) | |
| Defendants. ) | |

**<u>MEMORANDUM AND ORDER</u>**

This matter is before the Court on plaintiffs' motion for partial summary judgment. Defendants have not filed a response and the time for doing so has expired. The motion is ripe for disposition. For the following reasons, the motion will be granted in part and denied in part.

**I.      Background**

Plaintiffs Bernard Thornton, Lejuan Wiley, and Tyrone Cameron ("plaintiffs") filed a multi-count complaint against defendants Mainline Communications, LLC, Rodger Miller, Charter Communications, LLC, and Charter Communications, Inc. alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, and the Missouri Minimum Wage Law ("MMWL"), § 290.500 RSMo., *et seq.*, as well as common law claims for quantum meruit and unjust enrichment. Plaintiffs allege that they were misclassified as independent contractors and denied overtime pay. Defendants Charter Communications, LLC, and Charter Communications, Inc. were previously

granted summary judgment on plaintiffs' claims that they were joint employers. Now pending before this Court is plaintiffs' motion for partial summary judgment on their overtime wage claims under the FLSA and MMWL, counts I and III of their second amended complaint, against defendants Mainline Communications, LLC and Rodger Miller.

## II.  Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden is on the moving party. *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op. Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in his favor to allow a jury to return a verdict for him. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex*, 477 U.S. at 324. In ruling on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. *Matsushita,* 475 U.S. at 587; *Woods v. DaimlerChrysler Corp.,* 409 F.3d 984, 990 (8th Cir. 2005)

**III.    Facts**

The Court has reviewed plaintiffs' statement of uncontroverted material facts and the supporting documentation and, where appropriate, will accept facts as supported by appropriate admissible evidence. Further, the Court notes that defendants failed to specifically controvert plaintiffs' statement of facts and, therefore, those facts are deemed admitted for this motion. *O'Connell v. Accurate Plumbing, LLC*, 4:04CV1368 FRB, 2005 WL 2176926, at *2 (E.D. Mo. Sept. 8, 2005) (citing *Northwest Bank & Trust Co. v. First Ill. Nat'l Bank*, 354 F.3d 721, 724-25 (8th Cir. 2003); *Harris v. Interstate Brands Corp.*, 348 F.3d 761, 762-63 (8th Cir. 2003)). The undisputed facts, as supported by the record, are set forth below.

At all times relevant hereto, defendant Rodger Miller was the owner of Mainline Communications, LLC, which was engaged solely in the repair and installation of cable, internet, and telephone boxes throughout the St. Louis area. Plaintiffs Bernard Thornton, Lejuan Wiley, and Tyrone Cameron worked as technicians for defendants installing and repairing cable, internet, and telephone boxes.

Plaintiffs were required to report to Mainline on a daily basis and follow defendants' instructions as to when, where, and how they were to complete their daily job assignments. More specifically, plaintiffs were directed and controlled by defendants regarding when to report to scheduled jobs; where to report to scheduled jobs; when the workday ended; how much work they received and were required to perform each day; and how to perform the necessary services in order to properly complete the scheduled jobs on behalf of defendants. Mainline technicians did not have any input into work

procedures. Miller made all workplace decisions. Defendants had control over, and were responsible for, entering the jobs for each day into an online database, which plaintiffs would check prior to and after arriving at the Mainline office.

Plaintiffs and other Mainline technicians were tracked every minute they worked throughout the day. This tracking included when plaintiffs were on a job, when they completed a job, when they were in route to another job, drive time between jobs, lunch breaks, points assigned and completed per day, routing, late appointments, and repeat service and installation call rates. Plaintiffs were required to check in with Mainline office personnel throughout the day and regularly submit written reports.

Defendants provided plaintiffs with cable wire, wire splitters, and cable meters for use on their daily job assignments. Mainline tracked plaintiffs to make sure all equipment was turned in on a daily basis. Plaintiffs also used Charter equipment that was provided to them by Mainline, including cable boxes, modems, keys for lock boxes, fittings, ground blocks, and other items need to perform their installation and repair work.

Plaintiffs and other Mainline technicians were required to wear a Mainline uniform during job assignments and present themselves as Mainline employees. There were times when Miller would not let a technician work if he was not wearing a Mainline uniform. Mainline technicians also had to place signs on their vehicles that said "Mainline Communications."

When Plaintiffs began working at Mainline, they received on the job training from other Mainline technicians. Plaintiffs were not allowed to work in the field on their own until after training, and defendants had to approve them to work in the field. Mainline

4

trained its technicians according to certain specifications and requirements. Prior to working at Mainline, Thornton and Wiley had no experience in the cable industry.

Mainline required plaintiffs to work Monday through Saturday each week and sometimes on Sunday. If plaintiffs became sick and took off work, they were required to call and inform Mainline that they were staying home. If plaintiffs did not call in and receive permission prior to taking off work, they were subject to disciplinary action.

Mainline did not allow plaintiffs to perform cable installation services for any other companies or provide services on an independent basis. None of the plaintiffs owned any separate business and were not employed by any business other than Mainline. Plaintiffs did not advertise their services or hold themselves out as independent businessmen. Plaintiffs did not maintain their own facilities, but instead depended upon the use of the Mainline and Charter facilities. Plaintiffs had a mailbox with their name on it at Mainline's office. In or around July 2011, Mainline switched its technicians from a 1099 independent contractor structure to W-2 employees. Plaintiff Wiley testified that he had the same job duties when he was a W-2 employee as he had when he was labeled an independent contractor.

Plaintiffs were required to work each day until all jobs were completed, which required them to work over forty hours per week, and often through lunch breaks. Defendants failed to pay plaintiff Thornton for 359.48 hours of overtime from June 2010 through September 2011, and his overtime rate was $12.21 per hour in 2010 and $17.71 per hour in 2011. Defendants failed to pay plaintiff Wiley for 531.86 hours of overtime from March 2010 through August 2011, and his overtime rate was $31.22 per hour in

5

2010 and 2011. Defendants failed to pay plaintiff Cameron for 155.26 hours of overtime from June 2010 to August 2010, and his overtime rate was $23.64 per hour in 2010.

IV. **Law**

　A. **FLSA**

The FLSA provides minimum and overtime pay scales for covered employees. 29 U.S.C. §§ 201–219. Under the FLSA, "employee" is defined as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee" and "employ" as "to suffer or permit to work." 29 U.S.C. § 203(d); 29 U.S.C. § 203(g). These terms are broad and comprehensive in order to accomplish the remedial purposes of the FLSA. *United States v. Rosenwasser,* 323 U.S. 360, 362–63, (1945). "Therefore, the courts do not apply the traditional common law analysis to distinguish between 'employees,' to whom the FLSA applies, and 'independent contractors,' to whom it does not." *Dole v. Amerilink Corp.*, 729 F.Supp. 73, 76 (E.D. Mo. 1990). "Rather, the analysis focuses on the 'economic reality' of the employment relationship." *Id.* (citing *Sec'y of Labor, U.S. Dept. of Labor v. Lauritzen,* 835 F.2d 1529, 1534 (7th Cir.1987); *Brock v. Mr. W Fireworks, Inc.,* 814 F.2d 1042, 1043 (5th Cir.), *cert. denied,* 484 U.S. 924, 108 S.Ct. 286, 98 L.Ed.2d 246 (1987)).

Courts in this district that have considered this issue examine six factors to determine the economic reality of the working relationship. *Dole*, 729 F.Supp. at 76; *Pennington v. Integrity Communications, Inc.*, 1:12CV5 SNLJ, 2014 WL 2106301, at *3 (E.D. Mo. May 20, 2014) (citing *Bennett v. Unitek Global Services, LLC*, 10C4968, 2013

WL 4804841 (N.D. Il. Sept. 9, 2013); *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1312 (11th Cir. 2013)). The six factors to be considered are:

(1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;

(2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;

(3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;

(4) whether the service rendered requires a special skill;

(5) the degree of permanency and duration of the working relationship;

(6) the extent to which the service rendered is an integral part of the alleged employer's business.

*Dole*, 729 F.Supp. at 76; *Pennington*, 2014 WL 2106301, at *3. "The Court may not make its determination based on one particular factor, but rather must look to all the circumstances of the work activity." *Id.* (citing *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 730, 67 S.Ct. 1473, 1476, 91 L.Ed. 1772 (1947)). "Moreover, 'the factors are not exhaustive, nor can they be applied mechanically to arrive at a final determination of employee status.'" *Id.* (citing *Brock v. Mr. W Fireworks, Inc.,* 814 F.2d 1042, 1043 (5th Cir. 1987). "[T]he overarching focus of the inquiry is economic dependence." *Pennington v. Integrity Communications, Inc.*, 1:12CV5 SNLJ, 2014 WL 2106301, at *3 (E.D. Mo. May 20, 2014) (quoting *Scantland*, 721 F.3d at 1312). "Ultimately, in considering economic dependence, the court focuses on whether an individual is in business for himself or is dependent upon finding employment in the business of others." *Id.* (internal quotations and citations omitted).

B. **MMWL**

Missouri law provides that "[n]o employer shall employ any of his employees for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." Section 290.505 RSMo. Under Missouri law, an eight factor test governs the determination of plaintiffs' employment status. The Court considers: (1) the extent of control; (2) the actual exercise of control; (3) the duration of the employment; (4) the right to discharge; (5) the method of payment; (6) the degree to which the alleged employer furnished equipment; (7) the extent to which the work is the regular business of the employer; and (8) the [label used in the] employment contract[s]. *Gray v. FedEx Ground Package System, Inc.*, 799 F.3d 995, 1000 (8th Cir. 2015) (citations omitted). The Supreme Court of Missouri "has generally described an independent contractor as one who contracts to perform work according to his own methods without being subject to the control of his employer except as to the result of his work." *Howard v. City of Kansas City*, 332 S.W.3d 772, 782 (Mo. banc 2011) (internal quotation marks and citation omitted).

V. **Discussion**

Plaintiffs contend that the undisputed facts establish that defendants: (1) controlled the hiring and firing of the technicians; (2) trained the technicians, provided them with the requisite tools and uniforms, and controlled their schedules; and (3) routed plaintiffs, managed their individual performance, and disciplined them when necessary.

8

Plaintiffs argue that the "economic reality" of the relationship between defendants and plaintiffs was an employer-employee relationship under the FLSA and MMWL.

   A.   **FLSA**

In FLSA cases, similar issues have been addressed by a number of courts with varying results. Following bench trials, the court in *Solis v. Cascom, Inc.*, 3:09CV257, 2011 WL 10501391, (S.D. Ohio Sept. 21, 2011) held that cable installers were employees under the FLSA, and the court in *Parrilla v. Allcom Const. & Installation Services, LLC*, 6:08-cv-1967-Orl-31GJK, 2009 WL 2868432 (M.D. Fl. Aug. 31, 2009) held that cable installers were independent contractors exempt from the FLSA. Some courts faced with motions for summary judgment on the issue of whether cable installers are employees under the FLSA or independent contractors exempt from the FLSA have found that substantial factual disputes precluded summary judgment. *See Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308 (11th Cir. 2013); *Lang v. DirecTV, Inc.*, 801 F.Supp.2d 532 (E.D. La. 2011); *Keeton v. Time Warner Cable, Inc.*, 2:09-CV-1085, 2011 WL 2618926 (S.D. Ohio July 1, 2011); *Muller v. AM Broadband, LLC*, 07-60089-CIV, 2008 WL 708321 (S.D. Fl. March 14, 2008); *Santelices v. Cable Wiring*, 147 F.Supp.2d 1313 (S.D. Fl. 2001). Other courts have granted summary judgment finding that cable installers were independent contractors based on the particular facts of those cases. *See Keller v. Miri Microsystems, LLC*, 12-15492, 2014 WL 1118446 (E.D. Mi. March 20, 2014); *Bennett v. Unitek Global Services, LLC*, 10C4968, 2013 WL 4804841 (N.D. Il. Sept. 9, 2013); *Scruggs v. Skylink, Ltd.*, 3:10-0789, 2011 WL 6026152 (S.D.W.Va. Dec. 2, 2011); *Chao v. Mid-Atlantic Installation Services, Inc.*, 16 Fed.Appx. 104 (4th Cir. 2001);

*Herman v. Mid-Atlantic Installation Services, Inc.*, 164 F.Supp.2d 667 (D. Md. 2000). It is clear from the foregoing cases that the analysis is fact intensive and each court must make the determination as to the employment relationship on the particular facts before them.

Here, the facts before the Court are undisputed and result in a finding of an employer-employee relationship between plaintiffs and defendants. An analysis of the facts under the *Dole* six factors establishes that plaintiffs were employees under the FLSA and not independent contractors as labeled by defendants.

1. Control

Defendants exercised a high degree of control over the manner in which plaintiffs performed their installation and repair work. For instance, plaintiffs were required to report to Mainline on a daily basis and follow the directions of defendants. Plaintiffs were required to follow defendants' instructions as to when, where, and how to complete their daily job assignments. Plaintiffs were directed and controlled by defendants regarding when to report to scheduled jobs; where to report to scheduled jobs; when the workday ended; how much work they received and were required to perform each day; and how to perform the necessary services to properly complete the scheduled jobs. Defendants set rules regarding how plaintiffs operated in the field. Mainline technicians such as plaintiffs did not have any input into work procedures. Miller made all workplace decisions.

Plaintiffs and other Mainline technicians were required to wear a Mainline uniform during job assignments and present themselves as Mainline employees. There

were times when Miller would not let a technician work if he was not wearing a Mainline uniform. Mainline technicians also had to place signs on their vehicles that said "Mainline Communications."

Defendants required plaintiffs to work six or seven days per week. If plaintiffs became sick and took off work, they were required to call and inform Mainline that they were staying home. If plaintiffs did not call in and receive defendants' permission prior to taking off work, they were subject to disciplinary action.

Plaintiffs and other Mainline technicians were tracked every minute they worked throughout the day. This tracking included when plaintiffs were on a job, when they completed a job, when they were in route to another job, drive time between jobs, lunch breaks, points assigned and completed per day, routing, late appointments, and repeat service and installation call rates. In essence, plaintiffs and other Mainline technicians were monitored throughout the day down to the minute.

2. Opportunity for Profit or Loss

Plaintiffs had no opportunity to control profit or loss while working jobs for Mainline. Plaintiffs were required to work six to seven days per week. They were required to follow defendants' instructions as to when, where, and how to complete their daily job assignments. Plaintiffs were directed and controlled by defendants regarding when to report to scheduled jobs; where to report to scheduled jobs; when the workday ended; how much work they received and were required to perform each day; and how to perform the necessary services to properly complete the scheduled jobs on behalf of defendants. Again, plaintiffs did not have any input into work procedures. Miller made

11

all workplace decisions. With defendants maintaining this significant level of control over plaintiffs, plaintiffs had no opportunity to control profit or loss based upon their skill outside of their normal wages provided by Mainline.

Further, there is no evidence that plaintiffs were independent businessmen with an opportunity to control profit or loss. During their time at Mainline, plaintiffs were not allowed to perform cable installation services for any other companies or provide services on an independent basis. None of the plaintiffs owned any separate business, and they were not employed by any other business. Thornton and Cameron testified that they did not advertise their services or hold themselves out as independent businessmen.

3. Investment in Equipment or Materials

Defendants provided plaintiffs with cable wire, wire splitters, and cable meters for use on their daily job assignments. Defendants also provided plaintiff Cameron with a laptop. Defendants tracked plaintiffs to make sure all their equipment was turned in on a daily basis. In addition to the equipment provided by Mainline directly, Mainline provided plaintiffs with equipment that was issued by Charter including cable boxes, modems, keys for lock boxes, fittings, ground blocks, and other items need to perform their installation and repair work.

4. Special Skill

The undisputed facts show that the jobs plaintiffs performed required no prior special skills. Instead, plaintiffs received on the job training, which did not take a significant time before plaintiffs could work on their own. Plaintiffs Thornton and Wiley

testified that they had no experience in the cable industry prior to joining Mainline. Each plaintiff received training from other Mainline technicians.

     5.     Permanency and Duration

The undisputed facts show that plaintiffs' employment relationship with defendants was an indefinite, exclusive, at-will relationship of an employee. Plaintiffs did not have a definite employment period and each worked at Mainline for over two years.

     6.     Integral Part of Alleged Employer's Business

It is indisputable that the technicians play an integral role in the defendants' business. Defendants only business was repairing and installing cable, internet, and telephone boxes throughout the St. Louis area, and plaintiffs performed those services. Plaintiffs' services were defendants' core business and their duties included the entirety of defendants' business.

    **B.**    **MMWL**

Applying the foregoing facts to the MMWL and the eight factor test under Missouri law governing the determination of plaintiffs' employment status, this Court finds that plaintiffs were employees under the MMWL.

**VI.**    **Violations of the FLSA and MMWL and Damages**

Plaintiffs were required to work each day until all jobs were completed, which required them to work over forty hours per week, and often through lunch breaks. The FLSA requires that non-exempt employees be paid one and one-half times their hourly rate for hours worked in excess of forty hours in a single workweek. 29 U.S.C. §

207(a)(1). An employer who violates the FLSA is liable for unpaid overtime compensation and "an additional equal amount as liquidated damages." 29 U.S .C. § 216(b). The award of liquidated damages is not considered punitive, but is "intended in part to compensate employees for the delay in payment of wages owed under the FLSA." *Hultgren v. County of Lancaster*, 913 F.2d 498, 509 (8th Cir. 1990) (citing *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707, 65 S.Ct. 895, 89 L.Ed. 1296 (1945)). "An award of liquidated damages under section 216(b) is mandatory unless the employer can show good faith and reasonable grounds for believing that it was not in violation of the FLSA." *Jarrett v. ERC Props., Inc.*, 211 F.3d 1078, 1084 (8th Cir.2000).

The FLSA has a two-year statute of limitations for all actions to collect unpaid overtime; however, willful violations of the FLSA have a three-year statute of limitations. 29 U.S.C. § 255(a). Plaintiffs have not presented any evidence, or made any argument, to establish a willful violation of the FLSA. As a result, the two-year statute of limitations applies. This action was filed on March 15, 2012. Plaintiffs are entitled to overtime wages for the two-year period prior to the commencement of this action on March 15, 2012. The Court, therefore, will award damages from and after March 15, 2010. Plaintiffs' evidence, however, includes overtime wages outside of the statute of limitations as to plaintiffs Wiley and Cameron. Plaintiffs' request for overtime wages outside the two-year statute of limitations is denied.

The Court has reviewed plaintiffs' undisputed evidence and finds as follows:

Defendants failed to pay plaintiff Thornton for 359.48 hours of overtime from June 2010 through September 2011, and his overtime rate was $12.21 per hour in 2010 and $17.71 per hour in 2011. The total wages owed to plaintiff Thornton by

defendants for his 359.48 unpaid overtime hours is $9,580.94 in overtime wages and liquidated damages.

Defendants failed to pay plaintiff Wiley for 531.86 hours of overtime from March 2010 through August 2011, and his overtime rate was $31.22 per hour in 2010 and 2011. The total wages owed to plaintiff Wiley by defendants for his 531.86 unpaid overtime hours is $33,209.34 in overtime wages and liquidated damages.

Defendants failed to pay plaintiff Cameron for 155.26 hours of overtime from June 2010 to August 2010, and his overtime rate was $23.64 per hour in 2010. The total wages owed to plaintiff Cameron by defendants for his 155.26 unpaid overtime hours is $7,340.70 in overtime wages and liquidated damages.

The MMWL also provides for damages in the full amount of the wage rate and an additional equal amount as liquidated damages and has a two-year statute of limitations for overtime wage claims. *Section 290.527 RSMo*. Any award pursuant to the MMWL would be duplicative of the award pursuant to the FLSA and, therefore, the Court will not award damages on the plaintiffs' MMWL claims.

Finally, plaintiffs request their attorney's fees and costs. The FLSA provides that the court "shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and the costs of the action." 29 U.S.C. § 216(b). The Court will permit plaintiffs' counsel to submit verified documentation of the expenses and attorney's fees incurred. Defendants may file a written response to be heard on the matter.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiffs' motion for partial summary judgment (ECF #147) is **GRANTED** on plaintiffs' overtime wage claims under the FLSA and MMWL set forth in counts I and III of the second amended complaint. Judgment is

15

entered in favor of plaintiffs and against defendants on the overtime wage claims. Plaintiffs' claims for quantum meruit and unjust enrichment, counts VI and VII of the second amended complaint, remain pending.

**IT IS FURTHER HEREBY ORDERED** that plaintiffs' motion is granted in part and denied in part on plaintiffs' request for damages. Plaintiff Bernard Thornton is awarded damages pursuant to the FLSA in the amount of $9,580.94; plaintiff Lejuan Wiley is awarded damages pursuant to the FLSA in the amount of $33,209.34; plaintiff Tyrone Cameron is awarded damages pursuant to the FLSA in the amount of $7,340.70. Plaintiffs' request for damages outside the two-year statute of limitations is denied.

**IT IS FURTHER HEREBY ORDERED** that plaintiffs are granted fourteen days to submit verified documentation in support of their request for attorney's fees and costs. Defendants shall have seven days thereafter to file a response.

**IT IS FINALLY HEREBY ORDERED** that the trial setting on February 1, 2016 is vacated to be rescheduled at a later date.

Dated this 19th day of January, 2016.

_____
STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE